Amber L. Schubert (No. 278696)
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union Street, Suite 200
San Francisco, CA 94123
Tel: (415) 788-4220
Fax: (415) 788-0161
aschubert@sjk.law

Fletch Trammell (TX Bar No. 24042053)
*Pro hac vice forthcoming*
**TRAMMELL PC**
3262 Westheimer, #423
Houston, TX 77098
Tel: (800) 405-1740
Fax: (800) 532-0992
fletch@trammellpc.com

Don Bivens (AZ Bar No. 005134)
*Pro hac vice forthcoming*
Teresita T. Mercado (AZ Bar No. 020578)
*Pro hac vice forthcoming*
**DON BIVENS, PLLC**
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ, 85254
Tel: (602) 762-2661
don@donbivens.com
teresita@donbivens.com
***Counsel for Plaintiffs***

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Vanessa Bell, Destiney Murrah, and Sean Nugent, individually and as the representatives of a class of similarly situated persons, | |
| Plaintiffs, | Case No.: |
| v. | <u>CLASS ACTION</u> |
| R.J. Reynolds Vapor Company, R.J. Reynolds Tobacco Company, Reynolds America Inc., and British American Tobacco p.l.c., | **COMPLAINT** |
| Defendants. | <u>JURY TRIAL DEMANDED</u> |

Plaintiffs Vanessa Bell, Destiney Murrah, and Sean Nugent ("Plaintiffs"), bring this action on behalf of themselves, and all other persons similarly situated, and allege the following against R.J. Reynolds Vapor Company ("RJRV"), R.J. Reynolds Tobacco Company ("RJRT"), Reynolds America Inc. ("RAI"), and British American Tobacco p.l.c. ("BAT") (collectively, "Defendants"):

## NATURE OF ACTION

1.     This is a class action lawsuit against Defendants on behalf of all persons who purchased Vuse-brand vaporizer devices and consumable products (including the Vuse Solo, Vuse Vibe, Vuse Ciro, and Vuse Alto (the "Products")) in reliance on representations made by Defendants about the alleged carbon neutrality of the Products. As of 2021, according to BAT, Vuse was "[t]he number one global vaping brand by value share" and the leader in value share in 22 States.[1] And as of June 2024, Vuse's market share in the United States was approximately 41%.[2]

2.     In 2021, BAT announced that the Products were the first ever global carbon-neutral vape products, claiming that the production and use of the Products resulted in no net addition of CO2 to the atmosphere. BAT and its wholly owned direct and indirect subsidiaries, RJRV, RJRT, and RAI, prominently and repeatedly touted the Products as "carbon neutral," dedicating substantial marketing efforts to highlighting this purported environmental achievement.

3.     According to Defendants' representations, the Products' carbon neutrality involves reducing around 44% to 55% (depending on the year) of the Products' emissions through various initiatives, while offsetting the remaining percentage via the purchase of high quality carbon offset credits resulting from reforestation projects.  Between 2021 and 2024, according to public registries, Defendants allocated the majority of their carbon credit investments and retirements against the Vuse product line—84.72%—to four key forestry projects: the Guanaré Forest Plantations Project in Uruguay, the Yunnan Xishuangbanna IFM Project in China, the Hubei Hongshan IFM Project in China, and the Inner Mongolia Wu'erqihan IFM Project in China.

[1] https://www.tobaccoasia.com/news/bat%E2%80%99s-vuse-becomes-the-number-one-global-vaping-brand/ (last accessed May 28, 2025).
[2] https://www.2firsts.com/news/nielsen-report-vuse-market-share-drops-to-411-njoy-sales-up-8-in-four-weeks (last accessed May 28, 2025).

4.      However, Defendants' carbon neutrality claims are false and misleading because all four projects fail to provide genuine, additional carbon reductions. The Guanaré Forest Plantations Project purports to generate carbon credits by increasing carbon sequestration through tree planting. But these trees would have been planted regardless because the plantations would have been financially viable and established even without receiving financial incentives from carbon credits. The Yunnan Xishuangbanna Project, Hubei Hongshan IFM Project, and Inner Mongolia Wu'erqihan Project purport to generate carbon credits by preventing deforestation through forest protection measures. However, the forests that were the subjects of those projects faced negligible deforestation risks prior to the projects, meaning that the emission reductions claimed would have occurred anyway without the projects' intervention or the financial incentives provided by carbon credits. Indeed, an independent agency concluded that out of the approximately 500,000 carbon credits that Defendants have purchased since 2020, nearly 80% of them correspond to projects that have a either a "moderately low," "low," or "very low" likelihood of achieving actual emissions avoidance or removal.[3]

5.      In short, as to these four projects, the carbon reductions would have occurred regardless of Defendants' involvement or the projects' existence. And because Defendants' carbon neutrality claims are predicated on the efficacy and legitimacy of these projects, Defendants' carbon neutrality claims are false and misleading.

6.      Defendants know that their carbon neutrality claims influence consumers and cause them to purchase the Products as opposed to other, non-carbon neutral vape products. Given the similarity of vape products in the market, companies like Defendants need to find creative ways to differentiate their products. Here, Defendants relied on a strategy of inducing consumers to switch to and stick with Vuse because of the brand's purported carbon neutral status. They also relied on these representations to strengthen their company brands, which in turn enabled them to sell more of Products based on these representations.

7.      Defendants have effectively admitted as much. Take, for example, a July 22, 2021, press release by RJRV discussing ***its own research findings*** and touting the purported carbon neutrality of the Products:

---

[3] https://www.thebureauinvestigates.com/stories/2024-11-20/tobacco-giants-carbon-neutral-vape-was-offset-with-junk-credits (last accessed May 28, 2025).

*Bell, et al. v.  R.J. Reynolds Vapor Company, et al.*
CLASS ACTION COMPLAINT

A new poll conducted by Reynolds indicates **adult (age 21+) vapor consumers prefer brands committed to sustainability and reducing their environmental footprint**. . . . **[N]early half (46%) of consumers said they would prefer using a vapor product from a company that was successful in becoming carbon neutral**. A brand's environmental priorities and impact are increasingly important to consumers in considering their purchasing choices, with nearly a third of consumers broadly viewing a brand more favourably based on their environmental initiatives. Vuse, a leading alternative product to combustible cigarettes, was the first global vapor brand recently validated as carbon neutral by Vertis, which based its validation on product Life Cycle Assessment data provided by an independent third party. This world-first achievement for a global vapor brand is a significant contribution to BAT's ambitious climate targets, which include carbon neutrality across its own operations by 2030. Vuse's carbon neutrality status and ambition to increase sea freight is part of a bigger ambition to become an environmentally sustainable vape brand with initiatives including. . . . **BAT's sustainability efforts and commitment have received notable independent recognition.**[4]

8.     Through this statement and the others discussed below, Defendants prominently disseminated their "carbon neutrality" representations, thereby influencing the market and ensuring that consumers are aware of the claims. Consumers, including Plaintiffs, thus knew about, and reasonably relied upon, these representations when they made vaporizer and vape product purchasing decisions.

9.     As a result of Defendants' misleading claims, consumers have suffered economic injury in multiple ways: they paid a price premium based in part on false environmental claims; the deceptive marketing distorted the marketplace by falsely differentiating Defendants' products on environmental grounds; and, consumers did not receive the benefit of their bargain—they paid for vaporizers and vape products marketed as environmentally superior, but received products whose environmental claims rely on ineffective and redundant offset projects that fail to provide genuine carbon reductions.

10.     This action seeks to remedy Defendants' deceptive conduct and obtain compensation for consumers who paid premium prices for Products that failed to deliver their promised environmental benefits. Plaintiffs bring this action on behalf of themselves and other similarly situated consumers for violations of state consumer protection laws, breach of express and implied warranties, unjust enrichment, and fraud.

---

[4] https://www.prnewswire.com/news-releases/us-adult-vapor-consumers-prefer-innovative-brands-committed-to-sustainbility-and-to-reducing-their-environmental-footprint-301339694.html (emphasis added) (last accessed May 28, 2025).

**PARTIES**

11.    Plaintiff Vanessa Bell is a citizen of California and resides in San Pablo, CA. Vanessa Bell bought several Products, including a Vuse Alto device, Vuse Solo device, Vuse Vibe device, and Vuse Ciro device, in 2023 and 2024 from stores located in the Northern District of California.

12.    Plaintiff Destiney Murrah is a citizen of California and resides in Riverbank, CA. In November 2024, Destiney Murrah bought several products, including a Vuse Ciro device and Vuse Alto device, from a store located in California.

13.    Plaintiff Sean Nugent is a citizen of California and resides in Lafayette, CA.  Sean Nugent bought several products, including a Vuse Alto device and Vuse Vibe device, in 2022, 2023, and 2024 from stores located in California.

14.    Defendant RJRV is an indirect wholly owned subsidiary of BAT and an operating subsidiary of RAI.  It "manufactures tobacco- and menthol-flavored vapor products under the brand name 'VUSE,' and distributes those products for resale."[5] RJRV directly targets California by marketing and selling the Products for resale in the forum. Indeed, in a lawsuit challenging a California flavored tobacco products prohibition, a company executive declared that if the ban were to go into effect, the company would "have to spend millions of dollars on marketing-related activities to compete within the State of California for former consumers of menthol Vuse products who do not wish to stop using tobacco products."[6] The executive also declared that if certain Vuse products were banned in California, those products would be removed from the shelves of California retailers and thus RJRV would lose relationships with California retailers that have "taken years to build."[7]

15.    Defendant RJRT is an indirect wholly owned subsidiary of BAT and an operating subsidiary of RAI. It is the second-largest tobacco company in the United States. RJRV manufactures Vuse products "on [] behalf" of RJRT.[8]

16.    Defendant RAI is a holding company whose operating subsidiaries, including RJRV and RJRT, manufacture and sell tobacco and nicotine products.

---

[5] *R.J. Reynolds Tobacco Co. v. Bonta*, No. 3:22-cv-1755, ECF No. 13-4 ¶ 1 (N.D. Cal. Nov. 10, 2022).
[6] *Id.* ¶ 7.
[7] *Id.* ¶ 9.
[8] https://dev.rjrt.com/wp-content/uploads/2018/09/Supplier_Guide.pdf, at 4 (last accessed May 28, 2025).

17.     Defendant BAT directly owns 100% of RAI and is the indirect parent of RAI's operating subsidiaries. BAT refers to Vuse as "[o]ur leading Vapour product,"[9] and makes marketing statements—including those that include the carbon neutral representations[10]—about the Products. BAT has stated that "*[o]ur* [v]apour product[s] Vuse . . . are sold in the U.S."[11]

## <u>JURISDICTION AND VENUE</u>

18.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2) (the "Class Action Fairness Act") because sufficient diversity of citizenship exists between the parties – Plaintiffs are citizens of California and: (1) RJRV is incorporated in North Carolina and has its principal place of business in North Carolina; (2) RJRT is incorporated in North Carolina and has its principal place of business in North Carolina; (3) RAI is incorporated in North Carolina and has its principal place of business in North Carolina; (4) BAT is incorporated in the United Kingdom and has its principal place of business in the United Kingdom. Further, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, with more than 100 potential class members based on the class defined below. In addition, more than two-thirds of the members of the Class reside in a state other than the state in which Defendants are citizens, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

19.     The Court has specific personal jurisdiction over Defendants because they purposefully avail themselves of the California market and because Plaintiffs' claims arise from that conduct. Among other things, Defendants sell the Products to distributors and retailers throughout California, where the Products are purchased by California consumers. Alternatively, to the extent that BAT's direct contacts with California are insufficient for the Court to exercise specific personal jurisdiction over the company, RJRV's, RJRT's, and RAI's contacts with this forum should be imputed to BAT because they are agents or alter egos of BAT in view of the facts alleged in this Complaint, including:

- BAT owns 100% of RAI, which is the parent company of RJRV and RJRT;[12]

---

[9] https://www.bat.com/brands-and-innovation/vuse (last accessed May 28, 2025); *see, e.g.*, https://www.bat.com/media/press-releases/_2021/september/sep-08---bat-s-vuse-becomes-the-number-one-global-vaping-brand (last accessed May 28, 2025).

[10] *See, e.g.*, https://www.bat.com/media/press-releases/_2021/may/may-28---bat-s-vuse-becomes-world-s-first-global-carbon-neutral- (last accessed May 28, 2025).

[11] https://www.bat.com/brands-and-innovation/vuse (emphasis added) (last accessed May 28, 2025).

[12] https://www.bat.com/media/press-releases/_2017/july/Jul_25-BAT_Completes_Acquisition_of_Reynolds (last accessed May 28, 2025).

- BAT refers to RAI's offices in North Carolina as its U.S. offices; [13]

- BAT says that Vuse is "our leading Vapour product,"[14] and that Vuse is one of "our key brands";[15]

- RAI and its subsidiaries do not have boards of directors. RAI's board was disbanded after BAT acquired the company. Several of RAI's former board members are now BAT board members.[16] The BAT board reserves to itself certain "key matters on which it alone may make decisions" including "the Group's business strategy, its budget, dividends and major corporate activities," and is "responsible to shareholders" for "the Group's strategic direction."[17] The term "Group" refers to BAT "and all its businesses throughout the world."[18]

- RAI's CEO is on BAT's Management Board, which is "is responsible for overseeing the implementation of the Group's strategy and policies set by the Board, and for creating the framework for the day-to-day operation of the Group's operating subsidiaries."[19] He has stated that his "priorities are to drive the commercial success in the Group's most critical market" – the United States.[20] He "report[s]" to BAT's COO.[21]

- Each subsidiary of BAT must adopt BAT's "standards of business conduct" and "responsible marketing principles."[22] Adherence to BAT's "responsible marketing principles" is enforced by a "regular internal audit process."[23]

---

[13] https://www.bat.com/contact-us/global-directory/united-states (last accessed May 28, 2025).
[14] https://www.bat.com/brands-and-innovation (last accessed May 28, 2025).
[15] https://www.bat.com/brands-and-innovation/building-brands (last accessed May 28, 2025).
[16] *See, e.g.*, https://www.bat.com/who-we-are/our-leadership/main-board/holly-keller-koeppel (last accessed May 28, 2025); https://www.bat.com/who-we-are/our-leadership/main-board/luc-jobin (last accessed May 28, 2025).
[17] https://www.bat.com/who-we-are/our-corporate-governance/the-board/the-role-of-the-board (last accessed May 28, 2025).
[18] https://www.bat.com/investors-and-reporting/shareholder-information/faq/glossary-of-terms#batcom-tabs-a8c6cc750e-item-69899a7ba1-tab (last accessed May 28, 2025).
[19] https://www.bat.com/who-we-are/our-leadership/management-board (last accessed May 28, 2025); https://www.bat.com/who-we-are/our-leadership/management-board/david-waterfield (last accessed May 28, 2025).
[20] https://www.bat.com/who-we-are/our-leadership/management-board/david-waterfield (last accessed May 28, 2025).
[21] https://www.bat.com/media/press-releases/_2023/june/jun-19---bat-announces-changes-to-management-board-structure-and (last accessed May 28, 2025).
[22] https://www.bat.com/who-we-are/our-corporate-governance/policies--principles-and-standards (last accessed May 28, 2025).
[23] *Id.*

*Bell, et al. v.  R.J. Reynolds Vapor Company, et al.*
CLASS ACTION COMPLAINT

- BAT reports on RAI's financials in BAT's annual report;[24]
- Job applicants can submit applications to RAI positions in the United States (including in California) on BAT's website.[25]

20.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## DIVISIONAL ASSIGNMENT

21.    Pursuant to Civil L.R. 3-2(c), (e), this action should be assigned to the Oakland Division because a substantial part of the events or omissions giving rise to this action occurred in Contra Costa County.

## FACTS

I.    **The Climate Crisis**

22.    The climate crisis represents one of the most significant challenges facing humanity today. Scientific consensus demonstrates that human activities, particularly the emission of greenhouse gasses, are fundamentally altering Earth's climate system in ways that pose severe risks to human societies and natural ecosystems.

23.    At the heart of the climate crisis is the greenhouse effect: a natural warming process where atmospheric gasses trap heat from the sun that would otherwise escape into space. While this process is essential for life on Earth, human activities have dramatically increased the concentration of greenhouse gasses in the atmosphere, intensifying this effect beyond natural levels.

24.    Carbon dioxide ($CO_2$) is the primary greenhouse gas driving human-induced climate change, accounting for approximately 80% of U.S. greenhouse gas emissions from human activities. While $CO_2$ occurs naturally in Earth's atmosphere, human activities—such as the burning of fossil fuels (which releases $CO_2$ into the atmosphere) and deforestation (which destroys natural carbon sinks that would have otherwise

---

[24] *See, e.g.*, https://www.bat.com/content/dam/batcom/global/main-nav/investors-and-reporting/reporting/combined-annual-and-sustainability-report/BAT_Annual_Report_Form_20-F_2024.pdf, at 274 (last accessed May 28, 2025).

[25] https://careers.bat.com/en/job/indio/territory-manager-indio-ca/27325/22599774656 (responsibilities for "Territory Manager – Indio CA" include "Sell/execute the 5Ps of presence, pricing, promotion, product, and personal selling to customers and adult nicotine consumers.") (last accessed Mar. 28, 2025).

removed $CO_2$ from the atmosphere)—have increased atmospheric $CO_2$ concentrations to levels unprecedented in human history.

25.    The magnitude of human impact on atmospheric $CO_2$ levels is staggering. For over 800,000 years—a period encompassing all of human civilization—atmospheric greenhouse gas concentrations remained between 200 and 280 parts per million (ppm). However, since the Industrial Revolution, and particularly over the past century, these concentrations have skyrocketed to over 400 ppm, with current levels far exceeding anything experienced in human history.

26.    This dramatic increase in atmospheric $CO_2$ has disrupted Earth's natural carbon cycle—the process by which carbon moves between the atmosphere, land, oceans, and living organisms. While natural processes can eventually remove $CO_2$ from the atmosphere, the current rate of human-caused $CO_2$ emissions far exceeds the planet's natural absorption capacity. This imbalance results in a net accumulation of $CO_2$ in the atmosphere, intensifying the greenhouse effect and accelerating climate change.

27.    The impacts of climate change are already evident and affecting communities across the United States. These impacts include increased frequency and intensity of extreme weather events, rising sea levels threatening coastal communities, disruption of agricultural systems and food security, changes in precipitation patterns affecting water resources, extended wildfire seasons, deteriorating air quality, longer and more severe allergy seasons, and threats to critical infrastructure.

28.    The urgency of addressing climate change has led to significant international action. In 2015, nearly every nation adopted the Paris Agreement, a legally binding international treaty aimed at limiting global temperature rise by reducing greenhouse gas and $CO_2$ emissions. The United States has subsequently enacted domestic legislation, including the Inflation Reduction Act of 2022, to address climate change through emissions reduction.

## II.    Carbon Neutrality Claims

29.    Growing public awareness of the climate crisis is transforming consumer purchasing behavior, with research showing that an overwhelming majority of consumers actively seek out environmentally sustainable products. According to a comprehensive study conducted by IBM and the National Retail Federation, approximately 70% of consumers in the United States and Canada consider environmental sustainability a crucial factor in their purchasing decisions. The same research revealed that

8

these environmentally conscious consumers are willing to pay premium prices—on average 35% more—for products they believe are sustainable or eco-friendly. A different study conducted by NielsenIQ and McKinsey found that products with environmental, social and governmental related marketing outperformed those without such marketing by 8% annually. And according to RJRV's own research, "nearly half (46%) of consumers said they would prefer using a vapor product from a company that was successful in becoming carbon neutral" and "[a] brand's environmental priorities and impact are increasingly important to consumers in considering their purchasing choices, with nearly a third of consumers broadly viewing a brand more favourably based on their environmental initiatives."[26]

30.    In response to this consumer demand, companies like Defendants increasingly market their products as environmentally responsible, with "carbon neutral" becoming a prominent environmental claim. In relation to products, the term "carbon neutral" means that the production and use of a product results in no net addition of $CO_2$ to the atmosphere. This is typically achieved by either eliminating carbon emissions entirely from a product's production and use, or by balancing or "offsetting" carbon emissions from manufacture and use with an equivalent amount of carbon removal through verified offset projects.

31.    The practice of carbon offsetting requires companies to compensate for the emission of $CO_2$ or equivalent greenhouse gasses by providing for an emission reduction elsewhere. To offset emissions from the production and use of their products, companies typically purchase carbon "credits" in environmental projects such as forest preservation, renewable energy initiatives, and reforestation efforts. However, the effectiveness of these projects varies significantly.

32.    Central to legitimate carbon offsetting is the principle of "additionality"—the requirement that offset projects must result in carbon reductions that would not have occurred without the project. This principle is mandated by key international climate agreements, including Article 6 of the Paris Agreement and Article 6 of the Kyoto Protocol, which establishes that offset projects must demonstrate that credits/units are not awarded for emission reductions that would have happened anyway.

---

[26] https://www.prnewswire.com/news-releases/us-adult-vapor-consumers-prefer-innovative-brands-committed-to-sustainability-and-to-reducing-their-environmental-footprint-301339694.html (last accessed May 28, 2025).

33.     Companies wishing to demonstrate that their products are carbon neutral must meet rigorous standards established by technical specifications such as NQA's Publicly Available Standard 2060 and British Standards Institution's ISO 14068-1. These standards require companies to, among other things, accurately measure their carbon emissions, implement genuine reduction strategies, verify the effectiveness of any offset projects, ensure offset projects meet additionality requirements, and provide transparent documentation of their carbon neutrality claims.

### III.     Carbon Neutrality and "Greenwashing"

34.     The strong consumer preference for sustainable products has led to the proliferation of "greenwashing"—the practice of making false or misleading claims about the environmental benefits of a product. Companies engage in greenwashing to capitalize on growing environmental consciousness while avoiding the costs and challenges of achieving genuine sustainability.

35.     Carbon neutrality claims are particularly susceptible to greenwashing for a number of reasons, including the technical complexity of carbon accounting, the lack of transparency and reliable standards in the carbon offset market, companies' failure to properly qualify or explain their carbon neutrality claims, the questionable effectiveness of many offset projects, and limited regulatory oversight of environmental marketing claims.

36.     Carbon neutrality claims based on offsetting are particularly susceptible to greenwashing when companies rely on ineffective or redundant offset projects that fail to deliver genuine environmental benefits. This type of greenwashing occurs when, for example, offset projects would have happened regardless of the company's investment, when projects do not actually reduce emissions as claimed, or when the same environmental benefits are counted multiple times.

37.     Recognizing the potential for deception in environmental marketing claims, the Federal Trade Commission created the "Green Guides" (16 C.F.R. Part 260) to help marketers avoid making unfair or deceptive environmental claims. The Green Guides specifically address carbon offset claims, providing that marketers must "employ competent and reliable scientific and accounting methods to properly quantify claimed emission reductions" and ensure claims are appropriately substantiated. Under 16 C.F.R. § 260.5, it is deceptive to claim carbon offsets represent emission reductions if the same reductions are already required by law.

38.     Importantly, under 16 C.F.R. § 260.6(c), third-party certification does not eliminate a marketer's obligation to ensure that it has substantiation for all claims reasonably communicated by the certification. In other words, companies cannot simply rely on third-party certifications to validate their environmental claims - they must independently ensure the accuracy and reliability of their claims, including the effectiveness of any offset projects they use. Moreover, 16 C.F.R.§ 260.4 prohibits unqualified general environmental benefit claims, requiring companies to be able to substantiate all reasonable interpretations of their environmental claims.

## IV.     Defendants' False and Misleading Carbon Neutrality Claims

39.     In a May 28, 2021, press release, BAT announced that "Vuse has become the first global carbon neutral vape brand."[27] BAT stated that "[t]his world-first achievement is a significant contribution to the company's ambitious climate targets, which include carbon neutrality across its own operations by 2030."[28] BAT represented that "Vuse's carbon neutrality has been delivered through carbon offset through reforestation projects."[29] BAT "celebrate[d]" this purported achievement with a years-long marketing campaign that featured these carbon neutral representations:

---

[27] https://www.bat.com/media/press-releases/_2021/may/may-28---bat-s-vuse-becomes-world-s-first-global-carbon-neutral- ("Vuse has set the ESG standard within the vaping category by becoming the first global brand to secure carbon neutral status.") (last accessed May 28, 2025).
[28] *Id.*
[29] *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13



14
15
16
17
18
19
20
21
22
23
24
25



26
27
28

*Bell, et al. v.  R.J. Reynolds Vapor Company, et al.*
CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



19    40.    In its 2021 ESG report, BAT stated that it achieved "[c]arbon neutral certification for Vuse[,]

20  making it the first ever global carbon neutral vape brand."[30] BAT reiterated similar carbon neutrality

21  statements in other widely disseminated press releases, including in those as recent as June 6, 2022, and May

22  30, 2023.[31]

23

24  [30] https://www.bat.com/content/dam/batcom/global/main-nav/investors-and-reporting/reporting/combined-
     annual-and-esg-report/sustainability-reporting/BAT_ESG_Report_2021.pdf, at 2 (last accessed May 28,
25  2025).
     [31] https://www.businesswire.com/news/home/20230530005321/en/New-Clinical-Data-on-Vuse-Illustrates-
26  Beneficial-Public-Health-Impact-of-Tobacco-Harm-Reduction (May 30, 2023 press release: "Vuse is the
     No. 1 global vaping brand by market share and the first global carbon neutral vape brand.") (last accessed
27  May 28, 2025); *see* https://www.bat.com/media/news-and-stories/_2022/june/our-journey-to-a-greener-
     tomorrow (June 6, 2022 press release; "Our products are intrinsically linked to our sustainability ambitions

28

41.     In its July 27, 2023, responses to a climate change questionnaire, BAT underscored that its carbon neutral representations are central to its marketing strategies.  BAT wrote that it has "articulate[d] our commitment to reduce the environmental impact of our products (including **digital platforms to enhance consumer engagement via our Corporate and brand websites as demonstrated by Vuse**) to raise awareness of our ESG ambition and performance to date with a view of **enhancing consumer buy-in, brand loyalty, and generating growth through increasing market share of our products** to realise the opportunities presented by climate change."[32] BAT also explained that it ran an "engagement campaign to educat[e] consumers about [its] climate change performance and strategy," and used its "online platforms" to describe its "performance on climate-related issues."[33] And it specifically cited its activities surrounding Vuse as an example of this strategy.[34]

42.     BAT's indirect subsidiaries, RJRV and RJRT, followed BAT's lead and likewise made carbon neutrality claims about the Products on the Vuse website (which is operated by RJRV and RJRT)[35] and Vuse's social media accounts (which, upon information and belief, are operated by RJRV and RJRT):

---

and Vuse can proudly call itself the first global, independently certified, carbon neutral vaping brand.")
(last accessed May 28, 2025).
[32] https://www.bat.com/content/dam/batcom/global/main-nav/sustainability-esg/environment-and-climate/Climate_Change_2023.pdf. (emphases added) (last accessed May 28, 2025).
[33] *Id.*
[34] *Id.* ("For example, Vuse has reduced its carbon emissions by c.55% (as of March 2023) through its sustainability initiatives since launched in 2019, whilst offsetting the remaining 45%.").
[35] https://www.vusevapor.com/login; *see* https://www.vusevapor.com/footer-links/terms-of-use.html (RJRV and RJRT referring to the Vuse website as "our" site) (last accessed May 28, 2025).





*Bell, et al. v.  R.J. Reynolds Vapor Company, et al.*
CLASS ACTION COMPLAINT

UNDERAGE SALE PROHIBITED                                                                                                                          VAPOR PRODUCTS

1. **Why is Vuse just now talking about Sustainability?**
Adult Nicotine Consumers expect sustainability from the products and brands they purchase. We wanted to ensure that Vuse had the right programs and partners in place. These initiatives are just the start of the Vuse journey to become a more sustainable brand.

2. **What ESG actions does Vuse take?**
As a leading vapor brand, Vuse is demonstrating the kind of purposeful behavior expected from leading brands. Vuse's carbon neutrality status is part of our continued ambition to become a more environmentally sustainable vapor brand with initiatives including:

- **Cutting single use plastics from Vuse Alto packaging** – Vuse has removed unnecessary plastic wrap from its Vuse Alto device and pod packaging. This change keeps approximately 165,000 pounds of plastic out of landfills.[1]
- **Moving from air freight to sea freight** – By moving most of Vuse shipping from air freight to sea freight, Vuse reduced its $CO_2$ emissions by nearly half.[2]

*The image above is from a November 2024 archived version of Vuse's website.[36]*

### CARBON NEUTRALITY:

1. **What does Vuse mean by carbon neutrality?**
For Vuse, carbon neutrality refers to achieving net zero carbon emissions by offsetting the gross carbon emissions for Vuse Alto during its life cycle.

2. **What is a carbon offset?**
Carbon is a characteristic of greenhouse gas emissions. Carbon offsets generally relate to reductions from other actions designed to capture carbon, like tree planting, methane capture, and other actions. Offsets, or credits, may be purchased in the marketplace and traded to businesses in an effort to reduce their carbon footprint. One carbon credit is equivalent to one metric ton of carbon dioxide.

3. **How did you calculate how many carbon offsets to purchase?**
We performed a Life Cycle Assessment (LCA) for Vuse Alto. An LCA is a methodology for assessing the carbon impact and associated environmental impact for a product through all stages of its lifecycle—from material pre-processing and manufacturing, to distribution, use, and disposal. The LCA for Vuse Alto was prepared in accordance with ISO 14044: 2006 Environmental Management – Life Cycle Assessment – Requirements and Guidelines, which is the leading international standard on life cycle assessments. The Vuse Alto LCA was calculated, assured, and validated by independent third parties.

4. **What are your carbon offsets supporting?**
Vertis, who is one of the one of the first companies in the world to be involved in carbon markets, used the assured LCAs and data to broker investment in carbon credits, including a tree planting project in Uruguay covering land where intensive cattle grazing has eroded soil and degraded land. In addition to removing carbon dioxide and delivering better soil quality and biodiversity, the project will also result in increased availability and quality of employment opportunities.

*This image above is from a November 2024 archived version of Vuse's website.[37]*



*The image above was captured in November 2024 on Vuse's website.[38]*

---

[36] https://web.archive.org/web/20241113153944/https://www.vusevapor.com/footer-links/faqs-sustainability.html (November 13, 2024, archive version of https://www.vusevapor.com/footer-links/faqs-sustainability.html).

[37] *Id.*

[38] https://www.thebureauinvestigates.com/stories/2024-11-20/tobacco-giants-carbon-neutral-vape-was-offset-with-junk-credits/ (last accessed May 28, 2025).

16

vusevapor.com



## Every Action Matters

Discover how Vuse is working to be a more sustainable brand through plastic reduction, less carbon emissions, and the Vuse Alto becoming carbon neutral.

Nov 17, 2023

*The image above shows that a version of Vuse's website that Google indexed on November 17, 2023, contained carbon neutral representations. The linked webpage is no longer accessible.*[39]

43.    An archived June 2023 version of Vuse's website also touted the purported carbon neutrality of the Products on its "Sustainability" page, stating:

> Vuse Alto is the first carbon neutral vapor product. Vuse's carbon neutrality status is part of our continued commitment to become a more environmentally sustainable vapor brand. What does it take to achieve carbon neutrality? For Vuse, it means achieving net zero carbon emissions by purchasing carbon offsets that fund projects like reforestation in Uruguay.[40]

44.    And although Vuse's U.S.-based social media pages are no longer accessible, a 2024 study that analyzed RJRV's Instagram and Facebook posts between October 2019 and February 2022 reports that RJRV disseminated 14 posts with "Environmental and social justice" imagery, including one that stated: "Vuse Alto is the first-ever carbon neutral vapor brand! See all the changes Vuse is making to become a more sustainable brand at the link in our bio."[41] On information and belief, RJRV and RJRT continued to make carbon neutral representations on its U.S.-based social media pages until those pages taken down some time in or around 2023 or 2024.[42]

45.    In or around November 2024, a BAT spokesperson stated that all Vuse communications around carbon neutrality were terminated in December 2023.[43] But the representations pictured above that

---

[39] The date shown – November 17, 2023 – indicates that the linked article was either published or updated on that date.  *See* https://developers.google.com/search/docs/appearance/publication-dates (last accessed May 28, 2025).

[40] https://web.archive.org/web/20230601080420/https://vusevapor.com/blog/sustainability (footnote omitted) (last accessed May 28, 2025).

[41] https://formative.jmir.org/2024/1/e54661 (last accessed May 28, 2025).

[42] https://www.latterly.org/vuse-marketing-strategy/ (2024 article discussing how "Vuse leverages social media platforms and targeted online campaigns to reach potential customers where they are most active.") (last accessed May 28, 2025).

[43] https://www.thebureauinvestigates.com/stories/2024-11-20/tobacco-giants-carbon-neutral-vape-was-offset-with-junk-credits/ (last accessed May 28, 2025).

include the carbon neutral representations and post-date December 2023 demonstrate that the spokesperson's statement was incorrect. And a November 2024 article that reported that "[BAT's] Vuse brand got its green status via ineffective forestry project" stated that "[a]t the time of writing [the article], however, the Vuse website still carried the [carbon neutral] claim."[44] In any event, even if Defendants actually did cease making these representations at some point in December 2023 (they did not), it was far too late—the "carbon neutral" bell had been rung and Plaintiffs and consumers were making purchasing decisions under the understanding that the Products were carbon neutral.

46. At the time that the Plaintiffs purchased the Products, each Plaintiff had viewed at least one of the representations above and thus was aware of Defendants' representations that the Products were "carbon neutral." These representations led each Plaintiff to believe that the Products were, in truth, carbon neutral. Each Plaintiff relied on the Defendants' representations that the Products were "carbon neutral" when making their purchasing decisions, and those representations played a substantial part in each Plaintiff's decision to purchase the Products.

## V. The Reality Behind Defendants' Misleading Carbon Neutrality Claims

47. To substantiate its carbon neutrality claims, Defendants rely primarily on carbon credits certified by Verra. Verra is a nonprofit organization based in Washington, D.C., that administers and manages the Verified Carbon Standard (VCS) Program, which is a voluntary carbon offset program. Companies buying credits from Verra-listed projects rely on Verra as the third-party validator.

48. According to Verra's registries, between 2021 and 2024, Defendants retired 501,815 carbon credits, through the voluntary carbon market, specifically in relation to the Products. These credits are equivalent to approximately 0.5 million metric tons of $CO_2$. The majority of the carbon credits that the Defendants retired against the Products' emissions—84.72%—relate to four forestry projects, all of which are registered under Verra.

49. However, as detailed below, the carbon credits Defendants use to offset the Products' emissions overwhelmingly derive from four forestry projects that do not provide genuine, additional carbon reductions. These projects either (1) fund routine commercial forestry activities that would have occurred anyway, or (2) protect forested land that was already at minimal risk of deforestation. In each case, the

---

[44] *Id.*

emission reductions would have occurred regardless of the projects' existence or Defendants' participation. As a result, Defendants' reliance on these credits does not justify their "carbon neutral" claims and misleads consumers.

### 1. The Guanaré Forest Plantations Project Fails to Provide Genuine Carbon Reductions

50.    According to Verra's registry, Defendants purchased and retired credits from the Guanaré Forest Plantations Project in Uruguay to support its carbon neutrality claims. This project is an industrial afforestation effort spanning over 21,000 hectares (51,892 acres). Certified under Verra's "Afforestation, Reforestation, and Revegetation" methodology, the project ostensibly offsets carbon by planting eucalyptus trees that absorb carbon dioxide as they grow. According to Verra's registry, between 2021 and 2022, Defendants retired 186,990 credits from this project—approximately 37.26% of their total carbon offset portfolio related to the Products.

51.    The project involves short-rotation commercial eucalyptus plantations, in which trees are harvested for pulp production after 16 to 22 years and then replanted within the project's lifetime. The project is industrial in character and operates under a "dual" business model: it functions both as a conventional timber enterprise and as a carbon credit generator. The first image below is a satellite image showing the project zones (marked in yellow), and the second image below is an image of the project plantations.



*The satellite image above shows the Guanaré Forest Plantations Project zones (marked in yellow).*



*The image above is a photograph of the Guanaré Forest Plantations Project plantations.*

52.     The additionality of this project—the requirement that carbon reductions would not have occurred without the carbon financing—rests on the premise that these eucalyptus plantations would not have been financially viable without carbon credit revenue. According to the project documentation, the developers explicitly claim that "there are no wood industries located within a reachable distance from the project site" and that the forest management which the project entails would have been "only possible with the additional carbon financing."

53.     However, despite Defendants' reliance on carbon credits from the Guanaré Forest Plantations Project, the project fails to meet the fundamental requirement of additionality and does not provide genuine carbon reductions.

54.     First, geospatial analysis of the region reveals that it is densely populated with industrial eucalyptus plantations, with no evidence that the economics of such plantations depends on carbon credit revenues. Upon information and belief, these operations adhere to standard industrial timber practices, including planting, clearcutting, and replanting cycles—not materially different from the activities in the Guanaré Forest Plantations Project. The Guanaré Forest Plantations Project imposes no constraints on typical

20

pulp production activities that would differentiate it from standard commercial timber operations in the region. This indicates that such plantations are already financially viable business activities in this area, independent of carbon offset funding.

55.     The first image below is a satellite image showing widespread industrial tree plantations (in gray) in the area surrounding the Guanaré Forest Plantations Project region The second image below shows the same, but at similar dimensions to the image showing the project site above. The third image below is also a satellite image without any added markings. A comparison between image two and image three reveals that all visible forest cover consists of industrial tree plantations, indicating that no natural forest is present in the region.  The fourth image below shows tree cover gain from plantations established since 2000 (marked in blue), showing that industrial tree plantations have been a regional practice. In all four images, the Guanaré Forest Plantations Project region is marked with black lines.



*The satellite image above shows widespread industrial tree plantations (in gray) in the area surrounding the Guanaré Forest Plantations Project region (the project region is marked with black lines).*[45]

---

[45] Richter, J., et al., *Spatial Database of Planted Trees (SDPT Version 2.0)* (2023) (accessed through Global Forest Watch).

*Bell, et al. v.  R.J. Reynolds Vapor Company, et al.*
CLASS ACTION COMPLAINT



*The satellite image above also shows widespread industrial tree plantations (in gray) in the area surrounding the Guanaré Forest Plantations Project region (the project region is marked with black lines).*



*The satellite image above shows the tree cover in the area surrounding the Guanaré Forest Plantations Project region (the project region is marked with black lines).*

*Bell, et al. v.  R.J. Reynolds Vapor Company, et al.*
CLASS ACTION COMPLAINT

*The image above shows tree cover gain from plantations established since 2000 (marked in blue), showing that industrial tree plantations have been a regional practice (the project region is marked with black lines).*

56.     The inefficacy of this project has been the subject of reporting by investigative journalists. In November 20, 2024, *The Bureau of Investigative Journalism* reported that BAT was among the "biggest buyers of credits from the project" and that the legitimacy of the project had been questioned or undercut several independent organizations.[46] According to the report, Renoster – a technology company that creates software and data platforms for the carbon markets – gave the project a "zero rating" because "these trees were going to be planted regardless of the project."[47] Renoster also concluded that the project's "baseline assumption" – that "no emissions whatsoever would have been removed from the atmosphere if the [project] did not exist" – was "not reasonable . . . for the region because large potions of nearby land were already being converted from pasture to eucalyptus plantations."[48] Ultimately, Renoster concluded that it "would not consider carbon neutrality claims based on these particular credits to be legitimate."[49]

---

[46] https://www.thebureauinvestigates.com/stories/2024-11-20/harvard-set-up-worthless-carbon-offsetting-scheme-that-sold-millions-of-junk-credits (last accessed May 28, 2025).
[47] *Id.*
[48] *Id.*
[49] *Id.*

57.     According to the same report, a second organization, "BeZero Carbon, also assessed the project and raised similar concerns around additionality and baseline assumptions. It found that the project had a 'low' likelihood of achieving the purported emissions avoidance or removal."[50]

58.     Accordingly, the credits generated by the Guanaré Forest Plantations Project do not represent actual emissions reductions that are additional to business-as-usual commercial forestry practices. Because the afforestation activities likely would have occurred irrespective of carbon financing, the use of these credits by Defendants does not qualify as a legitimate offset of the Products' carbon emissions. Defendants' reliance on these non-additional credits to substantiate "carbon neutral" claims misrepresents the true environmental impact of the Products and deceives consumers who rely on those claims in making purchasing decisions.

**2.      The Yunnan Xishuangbanna Improved Forest Management Project Fails to Provide Genuine Carbon Reductions**

59.     According to Verra's registry, Defendants purchased and retired credits from the Yunnan Xishuangbanna IFM Project (VCS1664) to support its carbon neutrality claims. This project is a carbon offset initiative located in Yunnan Province, China. The project is certified under Verra's "Improved Forest Management" methodology and spans approximately 6,690 hectares (16,531 acres) of tropical forest. According to Verra's registry, between 2022 and 2023, Defendants retired 98,000 carbon credits from this project—constituting approximately 19.53% of their total Vuse Products-related carbon offset portfolio.

60.     The project claims to generate carbon credits by preventing deforestation and degradation within the project area, rather than through afforestation or reforestation. The project's methodology is premised on the assumption that, absent project intervention, the Yunnan Xishuangbanna forest would be subject to significant and imminent deforestation.

61.     The project documentation presents baseline assumptions that suggest rapid and extensive deforestation would occur without intervention. Specifically, the project baseline projects an annual deforestation rate of 67.17 cubic meters per hectare, with a total annual timber loss of 4,041,504 cubic meters. According to these projections, the entire project area would be completely deforested within just 17 years.

---

[50] *Id.*

62.     However, satellite and geospatial analysis of historical deforestation patterns reveals that these baseline assumptions dramatically overstate actual deforestation risk. Between 2001 and 2012—the year the project began—the project area lost only 137 hectares of tree cover, or approximately 2.2% of its total tree cover, equating to an average annual loss of just 11.42 hectares. Based on these trends, it would take approximately 586 years to fully deforest the area—over 34 times longer than the project's baseline projection. Moreover, estimated annual timber loss by volume during this period was approximately 13,089 cubic meters, also more than 34 times below the baseline estimate of 449,401 cubic meters.

63.     These inflated baseline figures enable the project to issue a large volume of carbon credits despite the absence of any meaningful threat to the forest. A comparison of the project boundaries with satellite imagery confirms that forest cover has remained largely intact, with only scattered and limited signs of deforestation. The data reflect a forest at low risk of conversion, contrary to the assumptions underpinning the project's carbon credit claims.

64.     The first image below is a satellite image showing the project areas (highlighted in red) scattered across a dense forest. The second image below is a geospatial image showing the project areas, with the pink marking areas of deforestation between 2001 and 2012 (and the project areas highlighted with black lines).



*The image above shows the the project areas (highlighted in red) scattered across a dense forest.*

25

*The above image is a geospatial image with the pink marking areas of deforestation in the vicinity of*
*the project area between 2001 and 2012, and the black lines representing the project area.*[51]

65.     Because the Yunnan Xishuangbanna project is located in an area with minimal deforestation pressure, and because its claimed emissions reductions are based on hypothetical scenarios that significantly exceed observed conditions, the carbon credits it generates do not meet the requirement of additionality. Under established carbon neutrality standards, only emissions reductions that are demonstrably additional to business-as-usual activity may be used as legitimate offset.

66.     Accordingly, the carbon credits generated by the Yunnan Xishuangbanna project do not represent genuine or additional emissions reductions. Defendants' reliance on these credits to support carbon neutrality claims for the Vuse Products misrepresents the true environmental impact of those Products and is inconsistent with accepted standards for credible carbon offsetting.

---

[51] *Hansen/UMD/Google/USGS/NASA* (accessed through Global Forest Watch).

### 3.    The Hubei Hongshan IFM Project Fails to Provide Genuine Carbon Reductions

67.    According to Verra's registry, Defendants purchased and retired credits from the Hubei Hongshan IFM (Conversion of Logged to Protected Forest) Project (VCS1935) to support its carbon neutrality claims. This project a carbon offset initiative located in Hongshan County, China. The project is certified under Verra's "Improved Forest Management" methodology and encompasses a total area of 302,800 hectares, with 23,769 hectares of active project activity. According to Verra's registry, between 2022 and 2024, Defendants retired 91,530 carbon credits from this project—constituting approximately 18.24% of their total carbon offset portfolio related to the Vuse Products.

68.    The project claims to generate carbon credits by preventing deforestation and forest degradation within the project area, rather than through afforestation or reforestation. Similar to the Yunnan Xishuangbanna Project, this project's methodology is premised on the assumption that, without intervention, the Hubei Hongshan forest would be subject to rapid and extensive deforestation.

69.    The project documentation presents baseline assumptions that suggest rapid and extensive deforestation would occur without intervention. Specifically, the project baseline projects an annual deforestation rate of 170.3 cubic meters per hectare, with a total annual timber loss of 4,041,504 cubic meters. According to these projections, the entire project area would be completely deforested within just 4.3 years.

70.    However, satellite and geospatial analysis of historical deforestation patterns reveals that these baseline assumptions dramatically overstate actual deforestation risk. Between 2001 and 2015—the year the project began—the project area lost only 253 hectares of tree cover, or approximately 2.1% of its total tree cover, equating to an average annual loss of just 16.87 hectares. Based on these trends, it would take approximately 1,408 years to fully deforest the area—more than 300 times longer than the project's baseline projection. Moreover, estimated annual timber loss during this period was approximately 12,373 cubic meters—more than 300 times lower than the baseline estimate of 4,041,504 cubic meters.

71.    This inflated baseline enables the project to issue a large volume of carbon credits despite the absence of meaningful threat to the forest area. A comparison of the project's boundaries with satellite imagery confirms that forest cover has remained largely intact, with minimal changes observed over two decades. The data reflects a forest at low risk of conversion, inconsistent with the project's claims of imminent logging.

72.    The first image below is a satellite image showing the project areas (highlighted in red) scattered across a dense forest. The second image below is a geospatial image showing the project areas, with the pink marking areas of deforestation between 2001 and 2015, green indicating the tree cover, and the black lines indicating the project area.



*The satellite image above shows the the project areas (highlighted in red) scattered across a dense forest.*

*Bell, et al. v.  R.J. Reynolds Vapor Company, et al.*
CLASS ACTION COMPLAINT



*The geospatial image above shows the project areas, with the pink marking areas of deforestation between 2001 and 2015 at a rate of 16.87 hectares per year, green indicating the tree cover, and the black lines indicating the project area.*

73.     Because the Hubei Hongshan project is situated in an area with minimal deforestation pressure, and because the project's claimed emissions reductions are derived from baseline scenarios that significantly exceed observed conditions, the carbon credits generated do not meet the requirement of additionality. Under established carbon neutrality standards, only emissions reductions that are demonstrably additional to business-as-usual activity may be used as legitimate offsets.

74.     Accordingly, the carbon credits generated by the Hubei Hongshan project do not reflect genuine or additional emissions reductions. Defendants' use of these credits to support their carbon neutrality claims for the Vuse Products misrepresents the true environmental impact of those Products and is inconsistent with accepted standards for credible carbon offsetting.

**4.     The Inner Mongolia Wu'erqihan IFM Project Fails to Provide Genuine Carbon Reductions**

75.     According to Verra's registry, Defendants purchased and retired credits from the Inner Mongolia Wu'erqihan IFM Project (VCS1715) to support its carbon neutrality claims. This project is a carbon offset initiative located in Wu'erqihan Town, in the Inner Mongolia Autonomous Region of China.

29

The project is certified under Verra's "Improved Forest Management" methodology and covers an activity area of approximately 43,167 hectares (106,668 acres). According to Verra's registry, in 2022, Defendants retired 48,647 carbon credits from this project—constituting approximately 9.69% of their total carbon offset portfolio relating to the Vuse Products.

76.    The project claims to generate carbon credits by preventing deforestation and degradation within the project area, rather than through afforestation or reforestation. Like the Yunnan and Hubei projects, the project's methodology is based on the assumption that, absent intervention, the Inner Mongolia Wu'erqihan forest would be subject to rapid and extensive logging or conversion.

77.    The project baseline projects an imminent and severe deforestation scenario. Specifically, it assumes an annual deforestation rate of 149.07 cubic meters per hectare, with a total annual timber loss of 6,435,041 cubic meters. According to these projections, the entire forested area would be completely deforested within just 1.4 years.

78.    However, satellite and geospatial analysis of historical deforestation patterns contradicts the project's assumptions. Between 2001 and 2013—the year the project began—the area experienced only 157 hectares of tree cover loss, averaging just 12.08 hectares per year. Based on these trends, it would take approximately 3,574 years to fully deforest the project area—more than 2,500 times longer than the baseline projection. Moreover, actual annual timber loss during this period is estimated at just 2,524 cubic meters, compared to the baseline figure of 6,435,041 cubic meters.

79.    The first image below is a satellite image showing the project areas (highlighted in red) scattered across a dense forest. The second image below is a geospatial image showing the project areas, with the pink marking areas of deforestation between 2001 and 2015, green indicating the tree cover, and the black lines indicating the project area.

30

1
2
3
4
5
6
7
8
9
10
11
12
13



14 *The satellite image above shows the project areas (highlighted in red) scattered across a dense forest.*

15
16
17
18
19
20
21
22
23
24
25
26
27
28



*Bell, et al. v.  R.J. Reynolds Vapor Company, et al.*
Class Action Complaint

*The geospatial image above shows the project areas, with the pink marking areas of deforestation between 2001 and 2015 at a rate of 12.08 hectares per year, green indicating the tree cover, and the black lines indicating the project area.*

80.  Because the Inner Mongolia Wu'erqihan project is located in an area with minimal deforestation pressure, and because its claimed emissions reductions are based on baseline scenarios that significantly exceed observed conditions, the carbon credits it generates do not meet the requirement of additionality. Under established carbon neutrality standards, only emissions reductions that are demonstrably additional to business-as-usual activity may be used as legitimate offsets.

81.  Accordingly, the carbon credits generated by the Inner Mongolia Wu'erqihan Project do not represent genuine or additional emissions reductions. Defendants' reliance on these credits to support carbon neutrality claims for the Vuse Products misrepresents the true environmental impact of those Products and is inconsistent with accepted standards for credible carbon offsetting.

## VI.    Plaintiffs and the Class Members Were Harmed By Relying On Defendants' False and Misleading Carbon Neutrality Claims

82.  As demonstrated above, Defendants' claims that the Products are "carbon neutral" are false and misleading. Defendants represent that while they have reduced around 44% to 55% (depending on the year) of these Products' emissions through various initiatives, the remaining percentage is offset through "the purchase of high quality carbon offset credits" resulting from "reforestation projects." However, the four primary projects from which Defendants purchase carbon credits to retire against the Products' emissions—accounting for 84.72% the credits retired against the Products' emissions—fail to provide genuine carbon reductions.

83.  Defendants cannot hide behind any independent organization's certification of these projects. As established by 16 C.F.R. § 260.6(c), third-party certification does not eliminate a marketer's obligation to ensure that it has substantiation for all claims reasonably communicated by the certification. Defendants, which promote the Products as "carbon neutral," should have independently verified that the projects they invest in meet the fundamental requirement of additionality.

84.  The carbon credits generated by the Guanaré Forest Plantations Project, the Yunnan Xishuangbanna IFM Project, the Hubei Hongshan IFM Project, and the Inner Mongolia Wu'erqihan IFM

Project would have occurred regardless of Defendants' involvement or the projects' existence. The Guanaré Project would have been commercially viable and established even without receiving financial incentives from carbon credits. The three Chinese "Improved Forest Management" projects faced negligible deforestation risk prior to the projects, meaning that the emission reductions claimed would have occurred anyway. Including these non-additional carbon credits in Defendants' offsetting calculations does not qualify as a genuine offset, which should generate carbon reductions equivalent to the emissions produced by the Products. By claiming carbon neutrality based on these ineffective and redundant offset projects, Defendants are misleading consumers about the true environmental impact of their products.

85.    Defendants' misrepresentations are material to consumers and drive consumers' (and Plaintiffs') purchasing decisions. As detailed above, research shows that consumers actively seek out environmentally sustainable products, with research showing that products with environmental, social, and governmental related marketing outperformed those without such marketing by 8% annually. According to Defendants' own research, "nearly half (46%) of consumers said they would prefer using a vapor product from a company that was successful in becoming carbon neutral" and "[a] brand's environmental priorities and impact are increasingly important to consumers in considering their purchasing choices, with nearly a third of consumers broadly viewing a brand more favorably based on their environmental initiatives." Defendants have capitalized on this consumer preference by prominently marketing their Vuse Products as "carbon neutral," using this purported achievement as a key differentiation point in their marketing strategy.

86.    Defendants' deceptive marketing practices also distort the marketplace and impair consumer choice. Consumers seeking to support environmentally responsible companies are deprived of the opportunity to make informed decisions about their purchases, as Defendants' false advertising may lead them to choose the Products over genuinely sustainable alternatives.

87.    At the time of purchase, each Plaintiff had viewed and was aware of Defendants' representations that the Products were "carbon neutral." These representations led each Plaintiff to believe that the Products were, in truth, "carbon neutral." Each Plaintiff relied on Defendants' representations that the Products were "carbon neutral" when making their purchasing decisions, and those representations played a substantial part in each Plaintiff's decision to purchase the Products.

88.     Consumers who purchased the Products, including each Plaintiff, suffered economic injury because Defendants' false "carbon neutral" claims deprived them of the ability to make informed purchasing decisions in the vaporizer market. These consumers paid a price premium for products they believed were "carbon neutral" but received products whose claimed carbon neutrality relies on ineffective and redundant offset projects that fail to provide genuine environmental benefits. Indeed, each Plaintiff would not have purchased the Products or would not have paid as much for the Products had Plaintiffs known that Defendants' "carbon neutral" representations were false.

89.     As a result of Defendants' false and misleading claims, consumers who purchased the Products, including each Plaintiff, suffered economic injury. These consumers paid a price premium for products they believed were "carbon neutral" but instead received products whose claimed carbon neutrality relies on ineffective and redundant offset projects that fail to provide genuine environmental benefits. In other words, consumers did not receive the benefit of their bargain—they paid for vaporizers with meaningful carbon neutrality but received vaporizers without this promised environmental benefit.

90.     Moreover, Defendants have been unjustly enriched by their deceptive conduct. The companies have benefited from increased sales and revenue by marketing the Products as "carbon neutral," capitalizing on consumer demand for sustainable products while failing to deliver the environmental benefits they promised.

## EQUITABLE RELIEF

91.     Plaintiffs have set forth alternate claims for damages and equitable relief. Plaintiffs do not have an adequate remedy at law with respect to future harm caused by Defendants' conduct as alleged herein.

92.     Absent an equitable injunction enjoining Defendants' conduct alleged herein, Plaintiffs, Class members, and the public will be irreparably harmed and denied an effective and complete remedy because they face a real and tangible threat of future harm emanating from Defendants' ongoing conduct that cannot be remedied with monetary damages.

93.     Plaintiffs do not know at this juncture whether Plaintiffs' damages claims will survive through trial, whether the Court will accept a model for legal damages for past harm that Plaintiffs will proffer at the appropriate time, or whether the Court will find that any such damages model adequately compensates Plaintiffs and the Class for their past losses.

94.    Plaintiffs continue to have use for the Products. Yet, they do not and cannot know if Defendants' advertising is accurate and truthful. If the Court were to enjoin Defendants from making the misrepresentations described herein, Plaintiffs would want to purchase the Products in the future. Without an injunction, Plaintiffs cannot trust Defendants' marketing claims and would not purchase the Products again.

95.    Moreover, damages alone would not prevent Defendants from continuing to make false and misleading claims about its products. No amount of money can rectify the harm caused to future purchasers.

## CLASS ALLEGATIONS

96.    Plaintiffs bring this action as a class action on behalf of themselves and all others similarly situated as members of the Class defined as follows:

      a.    All residents of California who after May 28, 2021, and within the applicable statute of limitations period(s), purchased any Vuse-brand vaporizer device or consumable product (including the Vuse Solo, Vuse Vibe, Vuse Ciro, or Vuse Alto), for purposes other than resale.

97.    Excluded from the Class is (a) the Defendants, their affiliates, and their employees; (b) persons who purchased or acquired the Products for resale; (c) Plaintiffs' counsel and Defendants' counsel; and (d) the judge and staff of the court assigned to this case, as well as any appellate court judges and staff assigned to any appeal in this matter, and their immediate family members.

98.    Plaintiffs reserve the right to modify or amend the definitions of the proposed Class, including by adding subclasses, before the Court determines whether certification is appropriate.

99.    **Numerosity (Fed. R. Civ. P 23(a)(1)).** The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is currently unknown to Plaintiffs, it is expected to include hundreds of thousands of customers nationwide who purchased the Products.

100.    **Commonality (Fed. R. Civ. P. 23(a)(2)).** Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. These common questions include:

      a.    Whether Defendants' representations that the Products are "carbon neutral" are false, misleading, or reasonably likely to deceive;

    b.   Whether Defendants failed to adequately validate the additionality of its carbon offset projects;

    c.   Whether Defendants engaged in deceptive or unfair business practices by marketing the Products as "carbon neutral";

    d.   Whether the Guanaré Forest, Yunnan Xishuangbanna, Hubei Hongshan, and Inner Mongolia Wu'erqihan carbon offset projects provide genuine carbon reductions;

    e.   Whether and to what extent Defendants' conduct caused Class members to pay price premiums for the Products;

    f.   Whether Defendants' conduct violates consumer protection laws;

    g.   Whether Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, or other relief; and

    h.   The amount and nature of such relief to be awarded to Plaintiffs and the Class.

101.    Plaintiffs and the members of the Class have a commonality of interest in the subject matter of the lawsuit and remedies sought.

102.    **Typicality (Fed. R. Civ. P. 23(a)(3)).** Plaintiffs' claims are typical of the claims of the members of the Class because all Class members were exposed to the same false or misleading carbon neutrality representations in purchasing the Products, and suffered similar economic injuries as a result.

103.    **Injunctive and/or declaratory relief (Fed. R. Civ. P. 23(b)(2)).** As demonstrated above, Defendants have acted on grounds generally applicable to the proposed Class such that final injunctive relief is appropriate with respect to the Class as a whole.

104.    **Fair and adequate representation (Fed. R. Civ. P. 23(a)(4))**. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained competent counsel experienced in class action litigation in state and federal courts nationwide, and Plaintiffs have no interest adverse to any member of the Class. Plaintiffs intend to prosecute this case vigorously on behalf of themselves and the Class.

105.    **Predominance and superiority (Fed. R. Civ. P. 23(b)(3)).** Common questions of law and fact predominate over any questions affecting only individual members, and a class action is superior to other methods for the fair and efficient adjudication of the controversy because:

a. Proof of Defendants' liability on Plaintiffs' claims will also prove liability for the claims of the Class without the need for separate or individualized proceedings;

b. Evidence regarding defenses or any exceptions to liability that Defendants may assert and attempt to prove will come from Defendants' records and will not require individualized or separate inquiries or proceedings;

c. Defendants have acted and is continuing to act pursuant to common practices in the same or similar manner with respect to all members of the Class;

d. The injury suffered by each member of the Class, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Defendants economically feasible. Even if members of the Class could afford individual litigation, those actions would put immeasurable strain on the court system. A class action, on the other hand, will permit a large number of claims involving virtually identical facts and legal issues to be resolved efficiently in one proceeding based upon common proofs, without the risk of inconsistent judgments; and

e. This case is inherently manageable as a class action in that:

    i. Liability and damages can be established for Plaintiffs and the Class with the same common proofs;

    ii. A class action will result in an orderly and expeditious administration of claims and it will foster economics of time, effort, and expense;

    iii. A class action will contribute to uniformity of decisions concerning Defendants' practices; and

    iv. As a practical matter, the claims of the Class are likely to go unaddressed absent class certification.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**Violation of California's Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750,** *et seq.*

**(Against all Defendants)**

106. Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

107. The California Consumers Legal Remedies Act ("CLRA") prohibits "unfair methods of competition and unfair or deceptive acts or practices [...] undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

108. The Products are "goods" within the meaning of Cal. Civ. Code § 1761(a).

109. Defendants are each a "person" within the meaning of Cal. Civ. Code § 1761(c).

110. Plaintiffs and Class members are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

111. Defendants violated and continue to violate the CLRA by engaging in the following practices proscribed by Cal. Civ. Code § 1770(a) in transactions with Plaintiffs and California Subclass members which were intended to result in, and did result in, the sale of the Products:

      a. Representing that the Products have characteristics, benefits, or qualities that they do not have (§ 1770(a)(5));

      b. Representing that the Products are of a particular standard, quality, or grade when they are of another (§ 1770(a)(7)); and

      c. Advertising goods with intent not to sell them as advertised (§ 1770(a)(9)).

112. Defendants' unfair or deceptive acts and practices were capable of deceiving a substantial portion of the purchasing public.

113. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the true nature of the Products' environmental impact. Specifically, Defendants represented the Products as "carbon neutral" when in fact the carbon offset projects Defendants rely on fail to provide genuine additionality or verifiable carbon reductions, namely that: the Guanaré Forest Plantations would have been planted regardless because the plantations would have been financially viable and

established even without receiving financial incentives from carbon credits; and the Yunnan Xishuangbanna IFM, Hubei Hongshan IFM, and Inner Mongolia Wu'erqihan IFM projects all involve forests that faced negligible deforestation risk prior to the projects, meaning that the emission reductions claimed would have occurred anyway, even without the projects' intervention or the financial incentives provided by carbon credits.

114. Defendants' uniform and material representations and omissions regarding the Products were likely to deceive, and Defendants knew or should have known that its representations and omissions were untrue and misleading.

115. Plaintiffs and members of the Class could not have reasonably avoided such injury. Plaintiffs and members of the Class were unaware of the existence of the facts that Defendants suppressed and/or failed to disclose, and they would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

116. Plaintiffs and the Class members suffered harm as a result of Defendants' violations because they relied on the carbon neutral claim in deciding to purchase the Products. The carbon neutral claim was a substantial factor in the purchasing decisions of Plaintiffs and the Class members. The carbon neutral claim was material because a reasonable consumer would consider it important in deciding whether to purchase the Products.

117. As a direct and proximate result of Defendants' violations, Plaintiffs and members of the Class have suffered harm in that they purchased Products they would not have purchased or paid significantly more than they would have paid had they known the truth about Defendants' representations.

118. Plaintiffs, on behalf of themselves and all class members, demand judgment against Defendants under the CLRA for injunctive relief.

119. Pursuant to Cal. Civ. Code § 1782(a), on May 7, 2025, Plaintiffs mailed Defendants a notice of its alleged violations of the CLRA by certified mail return receipt requested. The form, content, and delivery of the CLRA notice satisfy § 1782(a)(1) and (2). If, within thirty days after the date that Defendants received that notification, Defendants fails to provide appropriate relief for its violations of the CLRA, Plaintiffs reserve their rights to amend this Complaint to seek monetary damages. Notwithstanding any other

statements in this Complaint, Plaintiffs do not seek monetary damages in conjunction with their CLRA claim—and will not do so—until this thirty-day period has passed.

## SECOND CAUSE OF ACTION

**Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.***

**(Against all Defendants)**

120.     Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

121.     Plaintiffs have standing to pursue this claim because they have suffered injury in fact and have lost money or property as a result of Defendants' actions as described herein. Plaintiffs and Class members overpaid for the Products due to Defendants' misrepresentations and omissions about their carbon neutrality. Defendants' acts and practices alleged herein constitute unlawful, unfair, and fraudulent business practices in violation of the California's Unfair Competition Law ("UCL"). Cal. Bus. & Prof. Code §§ 17200, *et seq*.

122.     Defendants' conduct is unlawful because it violates the CLRA and Federal Trade Commission regulations regarding environmental marketing claims, including 16 C.F.R. § 260.4 (prohibiting unqualified general environmental benefit claims) and § 260.5 (requiring competent and reliable scientific evidence for carbon offset claims).

123.     Defendants' conduct is unfair because it offends established public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. The harm caused by Defendants' conduct outweighs any possible utility of such conduct. Additionally, Defendants' conduct was "unfair" because it violated public policy as declared by specific constitutional, statutory or regulatory provisions, including the CLRA and FTC regulations.

124.     Defendants' conduct is fraudulent because its representations about the Products' carbon neutrality are likely to deceive reasonable consumers. A reasonable consumer would not expect that Defendants' carbon neutral claims rely on offset projects that fail to provide genuine environmental benefits.

125.     Defendants' misrepresentations were material because reasonable consumers consider environmental impact when making purchasing decisions, and Defendants' deceptive carbon neutral claims were prominently featured in marketing the Products.

126.    As a direct and proximate result of Defendants' violations, Plaintiffs and California Subclass members have suffered injury in fact and lost money by purchasing Products they would not have purchased or by paying price premiums they would not have paid had they known the truth.

127.    Plaintiffs seek an injunction enjoining Defendants from engaging in the unlawful conduct alleged in this claim and requiring it to fully disclose the truth about the carbon neutrality of the Products, to discontinue their sale with the deceptive and misleading claims, and other appropriate equitable relief, including but not limited to issuing corrective disclosures. Without adequate disclosures of the Products' true environmental impact, continued marketing and sale of the Products are nearly certain to deceive Plaintiffs and Class members.

128.    Plaintiffs and the Class also seek restitution of all money and property lost as a result of Defendants' acts in violation of the UCL.

### THIRD CAUSE OF ACTION

**Violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq*.**

**(Against all Defendants)**

129.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

130.    California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, makes it unlawful for any person, firm, corporation, or association, or any employee thereof to induce the public to enter into any obligation relating to the sale or lease of any goods or services through the dissemination of any statement which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

131.    Defendants caused to be made and disseminated through advertising, marketing, and other promotional materials, statements concerning the characteristics, environmental benefits, and overall environmental impact of the Products that were untrue or misleading, and which Defendants knew, or by the exercise of reasonable care should have known, were untrue or misleading.

132.    Specifically, Defendants advertised and promoted the Products as "carbon neutral," implying that the environmental impact of the Products was fully offset through verified, additional, and legitimate carbon offset projects. In reality, the carbon offset projects relied upon by Defendants fail to provide genuine

additionality or verifiable reductions in carbon emissions. These projects would have occurred regardless of the financial support derived from carbon credits or involve lands with little to no deforestation risk.

133.    Defendants' false and misleading advertising is material in that it is likely to deceive a reasonable consumer. The "carbon neutral" claim was a substantial factor in the purchasing decisions of Plaintiffs and Class members, and Plaintiffs and Class members relied upon these representations in making their purchases.

134.    Defendants' representations were likely to, and did, deceive reasonable consumers regarding the true nature and environmental attributes of the Products.

135.    Plaintiffs and members of the Class could not have reasonably known the truth about Defendants' misrepresentations at the time of purchase. A reasonable consumer would not have been able to discover the falsity of Defendants' claims absent disclosure by Defendants or independent investigation into each carbon offset project.

136.    As a direct and proximate result of Defendants' violations of the FAL, Plaintiffs and Class members suffered injuries in fact and lost money or property in purchasing Products that were falsely and deceptively advertised.

137.    Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiffs and the Class seek an order of this Court enjoining Defendants from continuing to engage in the unlawful, unfair, and fraudulent business acts and practices alleged in this Complaint. Plaintiffs also seek restitution, the return of any money or property gained by means of Defendants' false advertising, and all other relief allowable under the FAL.

**FOURTH CAUSE OF ACTION**

**Breach of Express Warranty**

**(Against all Defendants)**

138.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

139.    Defendants provided an express warranty that the Products are "carbon neutral," meaning they result in no net addition of carbon dioxide to the atmosphere.

140.    This warranty became part of the basis of the bargain between Plaintiffs and Class members and Defendants.

141.    Defendants breached this warranty because the Products are not carbon neutral. Specifically, the Products' manufacturing process continues to generate carbon emissions; the carbon offset projects Defendants' relies on do not provide genuine, additional carbon reductions; the majority of claimed reductions from the Guanaré Forest Plantations would have been planted regardless; and the Yunnan Xishuangbanna IFM, Hubei Hongshan IFM, and Inner Mongolia Wu'erqihan IFM projects all involve forests that faced negligible deforestation risk prior to the projects.

142.    As a direct and proximate result of Defendants' breach, Plaintiffs and Class members have been damaged in the amount of the purchase price of the Products and/or the price premium they paid.

**FIFTH CAUSE OF ACTION**

**Breach of Implied Warranty**

**(Against all Defendants)**

143.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

144.    Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers of the Products, impliedly warranted that the Products are carbon neutral.

145.    Defendants breached the warranty implied in the contract for the sale of the Products because the Products did not conform to Defendants' representations that the Products they designed, manufactured, marketed, and/or sold are carbon neutral.

146.    Plaintiffs and Class Members purchased the Products in reliance upon Defendants' implied warranties of fitness for the Products' purpose.

147.    The Products were not altered by Plaintiffs and Class Members. The Products were defective when they left the exclusive control of Defendants.

148.    Defendants knew that the Products would be purchased and used without additional testing by Plaintiffs and Class Members.

149.    The Products were unfit for their intended purpose, and Plaintiffs and Class Members did not receive the goods as warranted.

150.    As a direct and proximate cause of Defendants' breach of the implied warranty, Plaintiff and Class Members have been injured and harmed because they would not have purchased the Products on the

same terms if they knew that the Products were not carbon neutral, and the Products do not have the characteristics, uses, or benefits as promised by Defendants.

151.    Plaintiffs and Class Members have been damaged in the amount of the purchase price of the Products and/or the price of the premium they paid.

**SIXTH CAUSE OF ACTION**

**Unjust Enrichment / Quasi-Contract**

**(Against all Defendants)**

152.    Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

153.    By purchasing the Products, Plaintiffs and Class members conferred a benefit on Defendants in the form of the purchase price of the Products.

154.    Defendants knowingly and willingly accepted and enjoyed these benefits.

155.    Defendants' retention of these benefits is inequitable and unjust because Defendants obtained them by misrepresenting the Products' environmental impact and deceiving Plaintiffs and Class members into believing they were purchasing carbon neutral products.

156.    Defendants have been unjustly enriched by retaining the revenues derived from Plaintiffs' and Class members' purchases of the Products. Retention of those monies under these circumstances is unjust and inequitable because Defendants misrepresented the nature of the Products.

157.    Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged in this complaint.

158.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs and Class members are entitled to restitution or restitutionary disgorgement in an amount to be proven at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs individually and on behalf of all other similarly situated persons, demand judgment in their favor and against Defendants R.J. Reynolds Vapor Company, R.J. Reynolds Tobacco Company, Reynolds America Inc., and British American Tobacco p.l.c. as follows:

a.   Certifying this case as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), and appoint Plaintiffs as class representatives and their counsel as Class counsel.

b.   Entering judgment against Defendants and in favor of Plaintiffs and the Class on all counts.

c.   Declaring Defendants' conduct to be unlawful.

d.   Awarding Plaintiffs and Class members compensatory, statutory, treble, and punitive damages to which Plaintiffs and Class members are entitled, to be determined by this Court and/or jury.

e.   Granting an order of restitution and all other forms of equitable monetary relief.

f.   Granting an order enjoining Defendants from labeling, advertising, or packaging the Products as "carbon neutral" as alleged herein.

g.   Awarding Plaintiffs and the Class their reasonable attorney's fees, expenses and costs of filing and prosecuting this action.

h.   Awarding such other and further relief as this Court deems appropriate and just.

## JURY DEMAND

159.   Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: May 28, 2025                    /s/ *Amber L. Schubert*

Amber L. Schubert (No. 278696)
**SCHUBERT JONCKHEER & KOLBE LLP**
2001 Union Street, Suite 200
San Francisco, CA 94123
Tel: (415) 788-4220
Fax: (415) 788-0161
aschubert@sjk.law

Fletch Trammell (TX Bar No. 24042053)
*Pro hac vice forthcoming*
**TRAMMELL PC**
3262 Westheimer, #423
Houston, TX 77098
Tel: (800) 405-1740
Fax: (800) 532-0992

*Bell, et al. v.  R.J. Reynolds Vapor Company, et al.*
CLASS ACTION COMPLAINT

1

fletch@trammellpc.com

2

Don Bivens (AZ Bar No. 005134)
*Pro hac vice forthcoming*

3

Teresita T. Mercado (AZ Bar No. 020578)
*Pro hac vice forthcoming*

4

**DON BIVENS, PLLC**

5

15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ, 85254

6

Tel: (602) 762-2661
don@donbivens.com

7

teresita@donbivens.com

8

***Counsel for Plaintiffs***

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Bell, et al. v.  R.J. Reynolds Vapor Company, et al.*
CLASS ACTION COMPLAINT